J-S61027-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DARRIN JEROME MUNFORD | : | |
| | : | |
| Appellant | : | No. 341 EDA 2019 |

Appeal from the Judgment of Sentence Entered December 10, 2018
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-CR-0003018-2017

BEFORE:   BOWES, J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                    **FILED MARCH 30, 2020**

Appellant, Darrin Jerome Munford, appeals from the judgment of sentence entered on December 10, 2018, as made final by the denial of Appellant's post-sentence motion on January 7, 2019.  We affirm.

The Commonwealth charged Appellant with burglary, criminal trespass, theft by unlawful taking, criminal attempt at involuntary deviate sexual intercourse ("IDSI"), and two counts of indecent exposure.[1]   ***See*** Commonwealth's Information, 6/5/18, at 1-2.  Appellant proceeded to a jury trial, where the following evidence was presented.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3502(a)(1), 3503(a)(1)(i), 3921(a), 901(a), and 3127(a), respectively.

L.H. testified on direct examination that, on October 25, 2017, she was working at the Healing Touch Massage. She testified that she worked at the shop primarily as a cleaning person and, sometimes, she would look after the store when the owner, C.C., was busy or not present. N.T. Trial, 9/13/18, at 61. L.H. testified that, on October 25, 2017, Appellant walked up to the door of the shop. She testified:

> [At t]hat period of time the owner [of the shop, C.C.,] was busy with something else so I was there watching the shop for her. I did not know [Appellant] very well so I opened the door for him. . . . Since I did not know [Appellant] very well I called [C.C.], asked her about the person and [C.C.] told me . . . that that's a questionable person. He used to have harassment activities in our store.

*Id.* at 51-52.

According to L.H., she then asked Appellant to leave. *Id.* at 52. Appellant, however, did not leave and, instead, began to pull L.H. inside of the shop. *Id.* at 53-54. L.H. testified that she fought back and "yell[ed] out help, help." *Id.* at 54. As L.H. testified, this scared Appellant and he fled. *Id.*

L.H. testified that, the next day, she dumped the garbage from the store and walked back inside to take a nap. *Id.* at 55. She testified that C.C. saw that Appellant was impermissibly present in the shop and C.C. asked L.H. to call a person named R.S., C.C.'s boyfriend. *Id.* at 72. L.H. testified that she telephoned C.C.'s boyfriend and told him to come to the shop. She testified:

> After I made the phone call I quickly tried to go outside then I met this intruder. He put me – he pulled me down. He

tried to pull me inside the room and we started some fight with each other and he put me on the bed.

At that moment he exposed his thing and he pulled my head towards it.

I felt he wanted to rape me so I started to fight him.

I was – at the same time I was yelling help, help and at that time [C.C.] was outside calling the police.

At the same moment he was trying to pull[] my pants down. I felt he was trying to rape me; that's why I fought with him.

*Id.* at 55-56.

L.H. testified that "[C.C.] called the police and somebody else came so [Appellant] was afraid" and left. *Id.* at 56.

During cross-examination, L.H. was confronted with her preliminary hearing testimony. She acknowledged that, during the preliminary hearing, she testified that, at approximately 10:00 p.m. on October 25, 2017, she and C.C. were in the process of closing the shop for the night. L.H. acknowledged that she testified that she went into the back room to go to bed when she "found something on the chair." *Id.* at 63. She acknowledged that she testified at the preliminary hearing that she "pulled open the curtain," saw Appellant standing there, and yelled. *Id.* at 63 and 66. As L.H. testified during the preliminary hearing, at this point, Appellant ran away because C.C. was still present in the shop. *Id.* at 64.

C.C., the owner of Healing Touch Massage, testified next. C.C. testified:

On [the evening of October 25, 2017,] I was working [in the shop] and [L.H.] was watching the store at the reception desk

and at that moment she went to some room and suddenly she yelled out. I was scared so much.

At that moment I saw [Appellant] was naked. He was standing by the room with two beds. When I saw him like that I yelled go, go as he was to leave.

He left. After he left we were not able to figure out how he got in so we checked the video recorder. After that we started to check every room, check all the windows including the window of the bathroom. At last we found one particular window in the back room. The screen was pulled up but there is still part of it opened. There's a flower pot that I placed somewhere that fell down and I started to check if I had anything missing. At that moment I did not find [] my key [or] the landline phone – the phone set [was] missing but later on I found those were missing. . . . The key that was missing [was the key to] both the . . . front door and my door of my room. . . .

[The next day, at approximately 8:00 or 9:00 in the evening, L.H.] went to dump the trash. After that she came in. [Appellant] was inside too. We were so surprised. I let [L.H.] call [my boyfriend]. At that time[, Appellant] locked me outside of [the] room. . . . I tried to open the door but I was not able to. I heard [L.H. yelling] inside help, help.

I ran into the street, tried to find someone to help us. I also went to the wine bar not far away from our store. I asked them to help me. Three person[s] responded. They came and helped me call the police. One of the individuals kicked the door and [Appellant] came out. I grabbed him but I was not able to fight with him and he took off.

*Id.* at 81-82, 83, 117, and 119 (some paragraphing omitted).

C.C. testified that Appellant stole approximately $60.00 from her shop on the second night that he came into her property. *Id.* at 84.

C.C. also testified that Appellant had a history of harassing them and that, prior to October 2017, she had photographed him multiple times. C.C.

testified: "[I took the photographs b]ecause [Appellant] came to harass us several times. We were afraid of him. That's why I took the photo[graphs]." *Id.* at 88. C.C. further testified that, in the spring of 2016, Appellant "came into the shop. He took off his clothing and . . . [h]e exposed himself . . . [and] we asked him to leave. He refused so we called the police. . . . When he realized that we called the police he left." *Id.* at 92-93.

The Commonwealth next called C.C.'s boyfriend, R.S., as a witness. R.S. testified:

> Well I think on [October 25, 2017, Appellant] came into the shop and harassed the girls. Usually when he comes he comes months apart. He'd come and he'd harass them and try to take something and get fresh or whatever but this time he came the next day. . . .
>
> [W]e nicknamed him [NBA] . . . [b]ecause he's a tall guy and he always wears basketball shorts or a warm up suit so[, on October 26, 2017, C.C.] called me [and said NBA, NBA,] come right away, come right away. So I turned right around and came back and also I called the cops at the same time.
>
> . . .
>
> [On] that particular day[, Appellant] locked [C.C.] out and she was yelling out in the street. So there was some people . . . there's a restaurant right there . . . and some people seen her . . . [s]o they came and [C.C.] told them that [Appellant] was inside with the other girl . . . [a]nd I think they called the police. So even though I called the police . . . when I got there the police [were] already there.

*Id.* at 134-135 (some paragraphing omitted).

Another individual, named Jimmy Schlier, Jr., testified that, on the night of October 26, 2017, he had just finished eating at a nearby inn "when a lady [ran] across the parking lot." *Id.* at 145. Mr. Schlier testified:

> She was very frantic. I couldn't quite understand what she was saying. She proceeded to have I think one of my buddies follow her over to the building next door of the parking lot where she had been beating on the door and very frantic about it.
>
> I followed over then and she kept saying danger, danger; something along the lines of something being inside that you know somebody was in trouble. . . . And then at that point I put my weapon on my side and then I had started to beat on the door. I had somebody call the cops. . . . At that point I believe I had my weapon drawn because I didn't know what was on the other side of the door and what could come out.
>
> When the gentleman came out I had told him that he needed to get on the ground and wait for the cops to come. He kept saying no man, it's good and he took off running and I holstered my weapon and waited for the cops to come.

*Id.* at 145-146 (some paragraphing omitted).

The Healing Touch Massage had two surveillance cameras that recorded the events of October 25 and 26, 2017. The surveillance video was played for the jury, with Detective James Wagner of the Pocono Township Police Department narrating. As Detective Wagner described the video for October 25, 2017, the video showed Appellant entering the shop, by himself and apparently with a key, and "quietly close the door as if he's sneaking in." N.T. Trial, 9/14/18, at 50-51. Appellant then spent an hour and 25 minutes "off camera in the back" of the shop. *Id.* at 51.

When Appellant next reappeared on camera, it was because L.H. discovered Appellant in the shop. *Id.* at 56. As Detective Wagner described:

> [The video shows L.H.] going back inside the kitchen. And then [L.H.] comes out of the kitchen and there is [Appellant]. . . . At some point during this interaction . . . I know that [R.S.] gets called. We heard that testimony and I knew that through the investigation that [R.S.] was called and that's where the [NBA] communication started. . . . [When Appellant appears on camera, h]e's leaning over towards [L.H.] He unlocks the door, gestures to her maybe to be quiet, tries to lean over and kiss her. She locks the deadbolt and the doorknob.

*Id.* at 56-57.

Detective Wagner described the video from October 26, 2017 in the following manner:

> That's [Appellant] coming back a second day. You can see what it looks like him removing a potential key [to] the door. . . . He appears to lock the doorknob.
>
> He pulls his cell phone out of his pocket and he's communicating with someone down the hallway. This is a customer who leaves. Clearly he's unlocking the door, [Appellant] locked, he goes out and you'll see [C.C.] as she testified she goes out to try to get help.
>
> And then watch. [Appellant r]ushes to the door, locks [C.C.] out. He turns into the kitchen.
>
> . . .
>
> [L.H.] is obviously off screen, she's in the back room. [Appellant is] in there snooping around the kitchen area.
>
> And again this is all significant in my investigation because this is not normal activity for invited in guests.
>
> Now [Appellant is] in the back where [L.H.] is in the back.

- 7 -

. . .

[The exterior camera shows that C.C.] leaves, comes outside. She went right. [Appellant] closes the door. She's now locked out and she's trying to get in the door. She's looking in – there's a window over here on the side. You can see her leaning over. That's the window into the kitchen area. . . . She's locked out of her business.

. . .

[C.C.] appears still trying to get into her business. She's frantically now going out to the road . . . trying to flag down help. And obviously there's no cars actually coming by.

The whole time that this is happening [Appellant] is still in the back and [L.H.] is in the back.

[C.C.] now runs over to the parking lot of the [nearby inn].

. . .

This is [C.C.] running to the door with [the friends of Jimmy Schlier, Jr. This is consistent with Mr. Schlier's testimony that they] came over first. Mr. Schlier eventually . . . pull[ed] in [with his truck]. . . . [C.C.] is over here with her hands, she's trying to communicate.

. . .

Mr. Schlier, as he testified, tried to break in the door and actually pounded on the door.

. . .

[Next we see Appellant] letting himself out and [L.H.] is following behind. . . . It looks like [L.H. is] pulling up her pants. [C.C.] went after [Appellant] and that's when Mr. Schlier encounters him off camera.

*Id.* at 61-66.

Appellant's fingerprints were found on the inside of the shop's windowsill. *Id.* at 172. Further, Detective Wagner testified that the fingerprints he found on the window were oriented in a way that was "consistent with . . . if someone had reached over, [and] pulled themselves up and through the window." N.T. Trial, 9/14/18, at 35-36.

Over Appellant's objection, the Commonwealth introduced evidence that, in 2003, Appellant committed multiple prior bad acts. First, Chief Brian Biechy of the Lehighton Borough Police Department testified that Appellant admitted to the following:

> [Appellant] stated [that] on June 9, 2003[,] . . . he was at the Mahoning Inn with friends who rented the room at the motel for a race weekend. After the race everyone checked out and left. [Appellant] did not leave and stayed in the room.
>
> [Appellant] stated he did undress and was lying on the bed naked so the cleaning lady would find him like that.
>
> When the cleaning lady did find [Appellant] naked on the bed she left and [Appellant] left the motel.
>
> . . .
>
> We received a similar complaint in August of the same year . . . [when Appellant] went to the same place and did the same thing.

*Id.* at 152-153 and 155.

Chief Biechy testified that the complainant declared that Appellant was found "naked on the bed masturbating at the time." *Id.* at 149. Further,

Appellant told the Chief that he knew that he did not have permission to be in the room at the time. ***Id.*** at 151.

Chief Biechy testified that Appellant was charged with criminal trespass and indecent exposure for both acts and he pleaded guilty to the charges. ***See id.*** at 155-156.

Detective Sergeant Kenneth E. Lenning, III of the Pocono Mountain Regional Police Department testified regarding three additional prior bad acts Appellant committed in 2003. As Detective Sergeant Lenning testified:

> The allegations [against Appellant] were he had went to a motel called the Sullivan Trail Motel . . . and he was there on three occasions. . . . On the last occasion which was August 16th he was apprehended inside one of the rooms.
>
> Two prior occasions, one being on July 31, 2003 and then another occasion on August 5, 2003 he had gone to the motel. He was trespassing in a room that he had no business being in. . . . [T]hrough the investigation it was determined he had confronted one of the chamber maids. He was nude at the time. He was lying in the bed that was closest to the door in the room that he wasn't supposed to be in . . . and he was masturbating at the time.
>
> . . .
>
> [As to the August 16, 2003 incident, Appellant admitted] that he had stolen the [hotel] key on August 5, 2003 and then used it on August 16th when he returned to that room and went into the room and was waiting for someone to come . . . [t]o find [him] naked and exposed.

***Id.*** at 159-161.

As a result of these actions in the Sullivan Trail Motel, the Commonwealth charged Appellant with indecent exposure, theft, criminal trespass, and burglary. *Id.* at 163.

At the conclusion of Appellant's trial in the case, *sub judice*, the jury found Appellant guilty of burglary, criminal trespass, and theft by unlawful taking; the jury also found Appellant not guilty of attempt to commit IDSI and both counts of indecent exposure. *Id.* at 255-256. On December 10, 2018, the trial court sentenced Appellant to serve an aggregate term of 54 to 108 months in prison for his convictions. N.T. Sentencing, 12/10/18, at 11.

The trial court denied Appellant's post-sentence motion on January 7, 2019 and Appellant filed a timely notice of appeal. He raises five claims in this appeal:

> 1. Did the trial court abuse its discretion by permitting [L.H.] to testify to hearsay evidence?
>
> 2. Did the trial court err in explaining the charge of criminal trespass and the meaning of "authorized person"?
>
> 3. Did the trial court abuse its discretion by admitting evidence of [Appellant's] prior bad acts?
>
> 4. Did the trial court abuse its discretion when it denied [Appellant's] post-sentence motion [for judgment] of acquittal on the burglary count as he was not convicted of the underlying offense claimed in the criminal information?
>
> 5. Did the trial court abuse its discretion by sentencing [Appellant] to an aggravated sentence based upon the unproven allegations of the criminal information?

Appellant's Brief at 6 (some capitalization omitted).

First, Appellant claims that the trial court erred in admitting portions of L.H.'s testimony, as the statements constituted inadmissible hearsay.

As this Court has stated:

> our standard of review for evidentiary rulings is a narrow one: when we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party. A party suffers prejudice when the trial court's error could have affected the verdict.

*Commonwealth v. Tyack*, 128 A.3d 254, 257 (Pa. Super. 2015) (quotations, citations, and corrections omitted).

According to Appellant, the trial court erred in allowing L.H. to testify as to certain statements C.C. made to her. Specifically, Appellant claims the trial court erred in allowing L.H. to testify that, when Appellant initially arrived at the shop on October 25, 2017, L.H. called C.C. and C.C. told her "that that's a questionable person. He used to have harassment activities in our store." *See* N.T. Trial, 9/13/18, at 51-52; Appellant's Brief at 13-14. Appellant claims that the quoted statement constitutes inadmissible hearsay and that it caused him "overwhelming prejudice." Appellant's Brief at 15. Appellant's claim fails because, even if the statement constituted inadmissible hearsay, the admission of the testimony was harmless beyond a reasonable doubt.

As the Pennsylvania Supreme Court explained:

> an erroneous ruling by a trial court on an evidentiary issue does not require us to grant relief where the error was

- 12 -

harmless. The Commonwealth bears the burden of demonstrating harmless error.

Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Chmiel**, 889 A.2d 501, 521 (Pa. 2005) (quotations and citations omitted).

Here, the admission of L.H.'s testimony was harmless beyond a reasonable doubt because it was "merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence." **See id.** To be sure, C.C. also testified at trial and C.C. specifically testified that, prior to the October 2017 incidents, she had taken multiple photographs of Appellant because "he came to harass us several times. We were afraid of him." N.T. Trial, 9/13/18, at 88. Further, R.S. testified that Appellant had a history of harassing L.H. and C.C. **See id.** at 131 ("[t]hey were having problems with a young man coming in and out and stuff like that and harassing them") and 134 ("on [October 25, 2017, Appellant] came into the shop and harassed the girls. Usually when he comes he comes months apart. He'd come and he'd harass them and try to take something and get fresh or whatever but this time he came the next day").

- 13 -

Therefore, even if the trial court erred in permitting L.H.'s hearsay testimony, the trial court's ruling did not prejudice Appellant, as both C.C. and R.S. testified that Appellant had a history of harassing L.H. and C.C. Appellant's first claim on appeal thus fails.

Next, Appellant claims that the trial court erred when it "fail[ed] to adequately recharge the jury . . . [on] the elements of criminal trespass." *See* Appellant's Brief at 16-17 (some capitalization omitted).

"When a court instructs the jury, the objective is to explain to the jury how it should approach its task and the factors it should consider in reaching its verdict." *Commonwealth v. Chambers*, 980 A.2d 35, 49 (Pa. 2009) (quotations omitted). "In examining jury instructions, our [standard] of review is to determine whether the trial court committed a clear abuse of discretion or an error of law controlling the outcome of the case." *Id.* at 50 (quotations omitted). "A charge will be found adequate unless the issues are not made clear, the jury was misled by the instructions, or there was an omission from the charge amounting to a fundamental error." *Id.* Moreover: "[i]n reviewing a challenge to a jury instruction the entire charge is considered, not merely discrete portions thereof. The trial court is free to use its own expressions as long as the concepts at issue are clearly and accurately presented to the jury." *Commonwealth v. Eichinger*, 915 A.2d 1122, 1138 (Pa. 2007) (quotations omitted).

On appeal, Appellant broadly claims that the trial court erred when it recharged the jury on the elements of criminal trespass. This recharge

- 14 -

occurred after the trial court originally charged the jury on the elements of criminal trespass, without objection, and was done in response to a jury question. In the words of Appellant:

> [the trial court's] recharge neither adequately nor accurately reflected the law, by failing to provide the jury with a full explanation of intent, mistake, and the reasonableness of the mistake, and was therefore insufficient to guide the jury through accurate and adequate deliberations.
>
> Applying the standard that [the Superior] Court must view the error in recharge and apply a reasonable doubt standard to it, in light of the jury's expressed confusion about the elements of criminal trespass, [the Superior] Court cannot determine beyond a reasonable doubt that that confusion did not also go to the defense of lack of intent through mistake or a reasonable belief of facts which, even if not ultimately and subsequently determined to be true, were reasonable when held by [Appellant] at the time of the alleged acts. Thus, clearly, the [trial] court's error on recharge was not harmless beyond a reasonable doubt, as it did not provide the jury with sufficient information to allow it to deliberate properly and accurately.

Appellant's Brief at 17.

Appellant does not point to any particular language or gap in the trial court's recharge that, allegedly, failed to "adequately [or] accurately reflect[]
the law." **See id.** Further, Appellant has not explained how the trial court "fail[ed] to provide the jury with a full explanation of intent, mistake, and the reasonableness of the mistake" and Appellant has not provided this Court with a specific and cognizable claim of error on this appeal. **See id.** This failure impedes our ability to conduct meaningful appellate review of this claim and, as such, Appellant's claim is waived. **See Commonwealth v. Kane**, 10 A.3d

327, 331 (Pa. Super. 2010) ("when defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived") (quotations and citations omitted).

For his third claim on appeal, Appellant contends that the trial court erred in admitting evidence of his prior bad acts.

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, as Pennsylvania Rule of Evidence 404(b) provides, this evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). Although not included within the enumerated list of permissible uses in Rule 404(b)(2), prior bad acts evidence may be admitted to assist in "proving the existence of a common scheme." ***Commonwealth v. Arrington***, 86 A.3d 831, 842 (Pa. 2014).

Our Supreme Court explained:

> Evidence of other crimes is admissible when it tends to prove a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others or to establish the identity of the person charged with the commission of the crime on trial, – in other words where there is such a logical connection between the crimes that proof of one will naturally tend to

show that the accused is the person who committed the other.

[The Pennsylvania Supreme] Court has often cited McCormick, Evidence, § 190 (1972 2d ed.), wherein evidence of other crimes is said to be admissible:

> To prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature.
>
> [MCCORMICK'S HANDBOOK ON THE LAW OF EVIDENCE § 190 (2d ed. 1972); *see*] *Commonwealth v. Morris*, 493 Pa. 164, 425 A.2d [715, 720-721 (1981) ] ("[T]here must be such a high correlation in the details of the crimes that proof that the defendant committed one makes it very unlikely that anyone else but the defendant committed the others.").

*Commonwealth v. Bryant*, 530 A.2d 83, 85-86 (Pa. 1987) (emphasis and some quotations, citations, and corrections omitted); *see also Commonwealth v. Hicks*, 156 A.3d 1114, 1128 (Pa. 2017) (plurality) (declaring that it is not enough for the Commonwealth to present "insignificant details of crimes of the same class, where there is nothing distinctive to separate them from, for example, common street crimes").

"A determination of whether evidence is admissible under the common plan exception must be made on a case by case basis in accordance with the unique facts and circumstances of each case." *Commonwealth v. Smith*, 635 A.2d 1086, 1089 (Pa. Super. 1993) (quotations, citations, and corrections omitted).

Regarding the degree of similarity between the crimes, we have explained:

> [w]hen ruling upon the admissibility of evidence under the common plan exception, the trial court must first examine the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator. Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive.

*Id.* (quotations and citations omitted).

Further, as to the balance between the probative value of the evidence and its potential for unfair prejudice, we have held:

> the trial court must assure that the probative value of the evidence [outweighs] its potential prejudicial impact upon the trier of fact. To do so, the court must balance the potential prejudicial impact of the evidence with such factors as the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations.

*Id.* (quotations and citations omitted).

Other than citing to the general law regarding prior bad acts evidence, Appellant's entire argument on appeal is as follows:

- 18 -

there is no specific indicia of a common element or theme, and no evidence presented that demonstrates that the activities presented at trial from 2003 were a "fingerprint" which would have overcome the test as to if the testimony as to those activities were unduly prejudicial. There can be no question that the evidence of the activities was prejudicial to [Appellant], that they were alleged to occur 14 years apart, and they were incredibly dissimilar, any similarities being those inherent in the commission of any crime of this nature.

Appellant's Brief at 24-25 (some capitalization omitted).

As with Appellant's second argument on appeal, this is simply a generalized argument. Appellant cites to no facts that are specific to his case and Appellant does not support his claim with any explanation as to why "there is no specific indicia of a common element or theme" between the crimes or as to why the crimes are "incredibly dissimilar." *See id.* Indeed, any analysis of this claim would require that this Court act as Appellant's advocate – which we are not permitted to do. *Bombar v. W. Am. Ins. Co.*, 932 A.2d 78, 93 (Pa. Super. 2007) ("[t]his Court will not act as counsel and will not develop arguments on behalf of an appellant"). As such, Appellant's claim on appeal is waived. *Commonwealth v. Spotz*, 716 A.2d 580, 585 n.5 (Pa. 1999) ("[the Pennsylvania Supreme Court] has held that an issue will be deemed to be waived when an appellant fails to properly explain or develop it in his brief").

Fourth, Appellant claims that the trial court erred when it denied his post-sentence motion for judgment of acquittal on his burglary conviction. According to Appellant, there existed a mistake in the Commonwealth's information. Specifically, the information declares:

**COUNT 3:** **Burglary – Overnight Accommodations** . . .

On or about: 10/25/2017 **18 § 3502 §§ A1I**
Between October 25, 2017 and October 26, 2017 in the County of Monroe, Pocono Township, Pennsylvania, [Appellant] entered a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a [crime] therein, to wit: [Appellant] entered premises lawfully owned or possessed by another with the intent to commit the crime of burglary.

Commonwealth's Information, 6/5/18, at 1.

Of note, the above burglary charge declares that Appellant intended to commit the predicate crime of "burglary." *See id.* Appellant acknowledges that the specific "intended" crime of "burglary" was a typographical error. Appellant's Brief at 27. Nevertheless, Appellant claims that, given this error, "the default [reading of the information] should be a plain reading of the statute for the offense charged, which would then make the second thing to prove that [Appellant] entered the location and commits, attempts or threatens to commit a bodily injury crime therein." *Id.* According to Appellant, since he was acquitted of the "bodily injury crimes" for which he was charged, he should likewise be discharged from his burglary conviction. *Id.* This claim fails.

In relevant part, burglary under 18 Pa.C.S.A. § 3502(a)(1) is defined as follows:

> **(a) Offense defined.**--A person commits the offense of burglary if, with the intent to commit a crime therein, the person:

- 20 -

(1)(i) enters a building or occupied structure, or separately secured or occupied portion thereof, that is adapted for overnight accommodations in which at the time of the offense any person is present and the person commits, attempts or threatens to commit a bodily injury crime therein;

(ii) enters a building or occupied structure, or separately secured or occupied portion thereof that is adapted for overnight accommodations in which at the time of the offense any person is present.

18 Pa.C.S.A. § 3502(a)(1).

We have explained:

the Commonwealth is not required to specify what crime a defendant, who is charged with burglary (or attempted burglary), was intending to commit. Further, the Commonwealth need not prove the underlying crime to sustain a burglary conviction. ***Commonwealth v. Lease***, 703 A.2d 506 (Pa. Super. 1997) (burglary conviction affirmed where defendant was acquitted of the underlying crimes of theft and receiving stolen property because the factfinder could have determined that the defendant entered the residence with the intent to steal but did not consummate the theft after entry)[;] ***see also Commonwealth v. Alston***, 651 A.2d 1092, 1095 (Pa. 1994) (Commonwealth is not required to allege or prove what particular crime the defendant intended to commit after entry into a residence.)

[However, w]hen the Commonwealth does specify, in the information or indictment, the crime defendant intended to commit, the Commonwealth must prove the requisite intent for that particular crime in order to prove a burglary or attempted burglary.

***Commonwealth v. Brown***, 886 A.2d 256, 260 (Pa. Super. 2005) (some citations omitted).

Here, as Appellant acknowledges, the Commonwealth's information contained a typographical error – it is nonsensical to charge a person with

- 21 -

burglary and declare that predicate crime for the burglary was burglary. Appellant claims that this error requires that we "default" to read the information as specifying that the intended crime be "to commit a bodily injury crime," as that is a required element of burglary under 18 Pa.C.S.A. § 3502(a)(1)(i) and the information specifically charged Appellant with committing burglary under Section 3502(a)(1)(i). Appellant's Brief at 27.

However, "a bodily injury crime" is not a specific, predicate crime. Therefore, even if we defaulted to read the information as specifying "a bodily injury crime," the Commonwealth would still not have been required to prove a specific bodily injury crime to sustain the burglary conviction – and Appellant's acquittals on the sexual offenses would not demand an acquittal on the burglary charge. *See Brown*, 886 A.2d at 260 ("the Commonwealth is not required to specify what crime a defendant, who is charged with burglary (or attempted burglary), was intending to commit. Further, the Commonwealth need not prove the underlying crime to sustain a burglary conviction").

Moreover, given the clear typographical error in the information, we must conclude that the information plainly does not specify what crime Appellant was intending to commit during the burglary. To be sure, the trial court instructed the jury on the elements of Appellant's burglary charge in the following manner:

> [Appellant] is also charged with burglary. To find [Appellant] guilty of burglary you must find that the following three elements have been proven beyond a reasonable doubt.

- 22 -

First, [Appellant] entered the premises in which the Healing Touch Massage was located.

Second, [Appellant] entered the premises with the intent to commit a crime inside.

Third, the premises in which Healing Touch Massage was located was a building or occupied structure or a separately secured or occupied portion of a building or structure that is adapted for overnight accommodations in which at the time of the offense any person was present.

N.T. Trial, 9/14/18, at 220-221.

The trial court's jury charge tracks the language contained in 18 Pa.C.S.A. § 3502(a)(1)(ii) – not 18 Pa.C.S.A. § 3502(a)(1)(i). Nevertheless, Appellant did not object to this charge. *See id.* Thus, Appellant was, in fact, convicted of burglary under 18 Pa.C.S.A. § 3502(a)(1)(ii) – and not burglary under § 3502(a)(1)(i). *See Commonwealth v. Clair*, 326 A.2d 272, 274 (Pa. 1974); *Commonwealth v. Matty*, 619 A.2d 1383, 1386-87 (Pa. Super. 1993); Pa.R.Crim.P. 647(b) ("[n]o portions of the [jury] charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate"); *Commonwealth v. Graham*, 576 A.2d 371, 375 (Pa. Super. 1990) (discussing harmless variances from the information). As such, consistent with the trial court's jury charge, the Commonwealth was merely required to prove that Appellant "entered the premises with the intent to commit **a crime** inside." *See* N.T. Trial, 9/14/18, at 220 (emphasis added); *see also* 18 Pa.C.S.A. § 3502(a)(1)(ii). The

- 23 -

Commonwealth did so. Indeed, Appellant was convicted of the predicate crime of theft in this case. Hence, Appellant's fourth claim on appeal fails.

Finally, Appellant claims that the trial court abused its discretion at sentencing when it "clearly considered[] and utilized . . . the offenses for which [Appellant] was acquitted" to sentence him in the aggravated range for his burglary conviction. Appellant's Brief at 29-30.

"[S]entencing is a matter vested in the sound discretion of the sentencing judge, whose judgment will not be disturbed absent an abuse of discretion." **Commonwealth v. Ritchey**, 779 A.2d 1183, 1185 (Pa. Super. 2001). Moreover, pursuant to statute, Appellant does not have an automatic right to appeal the discretionary aspects of his sentence. **See** 42 Pa.C.S.A. § 9781(b). Instead, Appellant must petition this Court for permission to appeal the discretionary aspects of his sentence. **Id.**

As this Court explained:

> [t]o reach the merits of a discretionary sentencing issue, we conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, Pa.R.A.P. 902, 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [42 Pa.C.S.A.] § 9781(b).

**Commonwealth v. Cook**, 941 A.2d 7, 11 (Pa. Super. 2007).

In the case at bar, Appellant filed a timely post-sentence motion where he preserved his specific discretionary aspect of sentencing claim. Appellant

also filed a timely notice of appeal.  Moreover, while Appellant's brief does not include the requisite Rule 2119(f) statement, the Commonwealth has not objected to this failure.  As such, we will "ignore the omission and determine if there is a substantial question that the sentence imposed was not appropriate" under the Sentencing Code.  ***See***, ***e.g.***, ***Commonwealth v. Kiesel***, 854 A.2d 530, 533 (Pa. Super. 2004) ("when the appellant has not included a Rule 2119(f) statement and the appellee has not objected, this Court may ignore the omission and determine if there is a substantial question that the sentence imposed was not appropriate, or enforce the requirements of Pa.R.A.P. 2119(f) *sua sponte*, *i.e.*, deny allowance of appeal").

Generally, to raise a substantial question, an appellant must "advance a colorable argument that the trial judge's actions were:  (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process."  ***Commonwealth v. McKiel***, 629 A.2d 1012, 1013 (Pa. Super. 1993); ***Commonwealth v. Goggins***, 748 A.2d 721, 726 (Pa. Super. 2000) (*en banc*), *appeal denied*, 759 A.2d 920 (Pa. 2000).  Appellant claims that the trial court improperly enhanced his sentence based upon conduct for which he had been charged, but then acquitted – specifically, the conduct relating to the sexual offense charges.  This presents a substantial question and allows us to review Appellant's claim.  ***See Commonwealth v. Downing***, 990 A.2d 788, 792 (Pa. Super. 2010) ("[a]ppellant's claim [that] the trial court relied on an improper factor raises a substantial question permitting review").

We have explained:

> sentencing is vested in the discretion of the trial court, and will not be disturbed absent a manifest abuse of that discretion. An abuse of discretion involves a sentence which was manifestly unreasonable, or which resulted from partiality, prejudice, bias or ill will. It is more than just an error in judgment.

*Commonwealth v. Crork*, 966 A.2d 585, 590 (Pa. Super. 2009) (quotations and citations omitted).

Further,

> A sentence is invalid if the record discloses that the sentencing court may have relied in whole or in part upon an impermissible consideration. This is so because the court violates the defendant's right to due process if, in deciding upon the sentence, it considers unreliable information, or information affecting the court's impartiality, or information that it is otherwise unfair to hold against the defendant.
>
> Simply put, the evidence upon which a sentencing court relies must be accurate, and there must be evidentiary proof of the factor[] upon which the court relied.

*Downing*, 990 A.2d at 793 (quotations and citations omitted).

Nevertheless, as we have held: "[a] judge may consider unadjudicated arrests in sentencing a defendant, so long as the arrests are not regarded as establishing criminal conduct, and even arrests that result in acquittals, **if the judge is aware of the acquittal**." *Commonwealth v. Bowers*, 25 A.3d 349, 356 (Pa. Super. 2011) (emphasis added); *see also Commonwealth v. Craft*, 450 A.2d 1021, 1024 (Pa. Super. 1982) ("a court, in imposing sentence[,] may consider prior arrests and concurrent charges as long as the

court realizes that the defendant had not been convicted on those prior charges").

Here, the trial court clearly realized that Appellant was acquitted of the sexual offense charges. To be sure, the trial court not only presided over Appellant's jury trial but, at sentencing, the trial court expressly stated that it was aware the jury acquitted Appellant of the sexual offense charges. *See* N.T. Sentencing, 12/10/18, at 8 (the trial court stated: "[t]he fact that you were acquitted of the sex crimes in this case certainly does not mean that I can't [take your past] history into consideration"). Therefore, in accordance with our precedent, since the trial court fashioned Appellant's sentence in full awareness of the fact that Appellant was acquitted of the sexual offense charges, we must conclude that the trial court did not consider an impermissible factor or abuse its discretion in sentencing Appellant. *See* *Bowers*, 25 A.3d at 356. Appellant's claim on appeal thus fails.

Judgment of sentence affirmed. Jurisdiction relinquished.

*Judgment Entered.*

_____
Joseph D. Seletyn, Esq.
*Prothonotary*

Date: _3/30/2020_

- 27 -